IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

| | | |
|---|---|---|
| WILLIAM GARCIA | § | |
| | § | CIVIL ACTION NO. 6:05cv180 |
| CHERYL EGAN, ET AL. | § | |

MEMORANDUM OPINION AND ORDER OF DISMISSAL

  The Plaintiff William Garcia, an inmate of the Texas Department of Criminal Justice, Correctional Institutions Division proceeding *pro se*, filed this civil rights lawsuit under 42 U.S.C. § 1983 complaining of alleged violations of his constitutional rights. The parties have consented to allow the undersigned United States Magistrate Judge to enter final judgment in this proceeding in accordance with 28 U.S.C. §636(c).

  An evidentiary hearing was conducted on June 22, 2006, pursuant to Spears v. McCotter, 766 F.2d 179 (5th Cir. 1985). At this hearing, Garcia testified that he arrived at the Michael Unit in February of 2004. He was seen by a physician's assistant named Cheryl Egan. Garcia was concerned about a possible prostate problem, so he mentioned it to her. Egan threatened to give him a major case if he did not leave the infirmary. She then approached him and took his eyeglasses, telling him that they did not meet security requirements because they were tinted.[1] However, Garcia says, these glasses were prescribed for him due to light sensitivity. He tried to explain this to Egan, but she would not listen.

  As a result, Garcia says, he was assigned to work in the field, in a garden squad. He says that he was only at the Gurney Unit for about a week and that he only worked in the field for two days.

---

[1] In fact, Garcia explained, the lenses were transitional, meaning they became darker or lighter in accordance with the light.

However, Garcia said, his eyes watered, he had headaches, his feet swelled up, and he suffered from back pain.

At the time, Garcia said, his work restrictions included restrictions of no prolonged standing, limited walking, limited exposure to the sun, and limited work due to his age, which was 61. He conceded that he was tested for his prostate shortly after his appointment with Egan.

When he arrived at the Neal Unit, after leaving Gurney, Garcia said, he was told that he had to wait a year before he could get another pair of glasses.[2] He reiterated that his glasses were not tinted but transitional and said that they had been approved by a sergeant before Egan took them away. Garcia explained that when he arrived at the Gurney Unit, he had two pairs of glasses, one for outside use and one for inside. His outside pair of glasses were taken away, but he still has his inside set.

Garcia said that he sued Dr. Denise DeShields, the medical director for the University of Texas Medical Branch, the agency which furnishes health care for Texas prisoners, because he was told to do so. He said that he did not think that she should be a defendant in the case and acceded to her dismissal.

Garcia named two unknown persons, but said that he was told to put in some unnamed people just in case he learned the names of anyone else who should be responsible. He also referred to two physicians at the Neal Unit, Dr. Lacy and Dr. Bassey, but did not explain what these persons had done to him.

Next, Garcia named Stephen Swift, who at the time was the warden of the Gurney Unit. He said that Swift, as warden, should have control over what occurs at the unit. He added that he sued C. Moore, the practice manager at the Gurney Unit, because he wrote to Moore complaining about the incident but was denied, and that although he named Tim West, another official at UTMB, he did not intend to sue West, but was just saying that he had tried to get in touch with him.

---

[2]In a pleading filed December 5, 2005, Garcia concedes that this is an "unwritten rule."

Warden Wesley Pratt, a TDCJ-CID warden from the Michael Unit who was present at the Spears hearing, testified under oath concerning prison policy. Warden Pratt said that inmates are allowed to have tinted glasses, including transitional lenses, but noted that Garcia said that he had two pairs of glasses, and he is only allowed to have one.

Nurse Thomas Maciel, a prison nurse who was present at the Spears hearing, testified under oath concerning the contents of Garcia's medical records. Nurse Maciel said that Garcia saw Egan on February 23, 2004. She took his glasses and gave him work restrictions. On March 3, 2004, Garcia had a prostate exam, which proved normal, and received two additional work restrictions.

Nurse Maciel stated that with the work restrictions that Garcia received, an assignment to the field force was proper so long as it was to a medical squad. Warden Pratt also stated that Garcia's work restrictions were consistent with an assignment to a medical squad, and noted that Garcia did not have a restriction for dark glasses. He said that there was nothing unusual about assigning Garcia to the field force.

Garcia complained that when Egan took his glasses, no eye exam was performed. He stated that his glasses had been prescribed for him in the free world. He said that he went to an eye doctor in prison but was denied covers to place on his glasses as a light shield.

Finally, Garcia's complaint appeared to raise a claim of retaliation. He indicated that Egan was "retaliating" against him for asking for a prostate exam. Garcia stated that Egan only checked his heart and lung sounds, and said that the rest of the exam was completed by the other physician's assistant, who gave him the prostate exam.

Garcia's Medical Records

The Court has received and reviewed certified, authenticated copies of Garcia's medical records. These records show that Garcia was seen by physician's assistant Cheryl Egan on February 23, 2004. She noted his medical history and gave him restrictions of no walking over 300 yards and no lifting over 24 pounds. Egan ordered various tests, including an EKG, chest X-ray, cholesterol testing, blood sugar testing, and screening for tuberculosis and AIDS, and ordered a refill of Garcia's

prescription for Zantac, an antacid.  She noted that he had been off of seizure medications since 1983, and wrote that his tinted lenses were given to security.  A rectal examination was noted as "deferred."

On February 27, three days later, Garcia was examined by a licensed vocational nurse named Ruth Orloff.  She noted that Garcia was complaining about back pain, dizziness, and having his glasses taken away.  She gave him ibuprofen for the back pain.  On March 3, 2004, Garcia was seen by another physician's assistant, Ronald Graves.  At this time, he received a prostate exam, which proved normal.  Graves also gave him additional work restrictions.

On March 9, 2004, Garcia wrote a sick call request saying that he suffers from a chronic allergy that makes his breathing difficult.  A sick call appointment was scheduled, and he was seen on March 11.  A nurse named Flanagan gave him a prescription for an antihistamine called chlortrimeton.

On March 24, 2004, Garcia filed another sick call request complaining about his allergies, and he was seen the next day.  At this appointment, he was given prescriptions for a decongestant called pseudoephrine HCL and for acetaminophen (Tylenol).

On April 8, 2004, Garcia had a mental health screening, and was referred for additional examination.  This was conducted on April 20, 2005, at which time Garcia stated that he had previously had a fractured skull and had a history of seizures.  His mental status was within normal limits, but he complained that he was having dizziness, nightmares, poor sleep, and loss of appetite.  A few months later, however, on July 14, 2004, Garcia said that he was doing okay, he was no longer having problems with bad dreams, and that his appetite was good.  In October of 2004, Garcia was seen for complaints of chronic nasal congestion, for which he received an antihistamine called periactin.  On December 14, 2004, Garcia complained about a hernia, and on December 22, 2004, he received a flu shot.  Other than the sick call on February 27, Garcia never mentions the loss of his glasses or any medical conditions which may have stemmed from the loss of his glasses.

Garcia filed a Step One grievance complaining about the loss of his glasses and the lack of a prostate exam, and saying that Egan ran him out after only two minutes (grievance no. 2004113130). The response was that personality conflicts are not grievable and it is up to the medical provider to determine what is required in an exam. The response also stated that tinted or colored glasses are not permitted unless prescribed by prison eye doctors and that Garcia received a prostate exam on March 3. Garcia filed a Step Two appeal of this grievance, and the response was that he had been advised appropriately at Step One. Garcia had been transferred to the Neal Unit and there was no documentation that he had filed a sick call request to address vision concerns or the need of replacement glasses.

On June 6, 2004, Garcia wrote to the Patient Liaison Office complaining of Egan's actions. He says that Egan allowed a white inmate to keep his glasses and that Warden Swift is responsible for all personnel within the perimeter of the prison, even contract employees such as Egan. In this letter, Garcia stated that he would not accept any eyeglasses from TDCJ-CID because they are of "lower quality" and his confiscated ones did not pose a threat to security. His letter was forwarded to Dr. Denise DeShields, but she wrote to him saying that the referral of the letter to her was in error because it occurred at the Gurney Unit, outside of her area of jurisdiction, and he had not voiced any complaints concerning his eyes or prostate since arriving at the Neal Unit. Dr. DeShields did note that because of Garcia's age, he would be routinely scheduled for prostate exams.

Dr. DeShields sent Garcia's letter to Dr. Owen Murray at the University of Texas Medical Branch. It was sent from there to Tim West, practice manager at the Palestine Cluster (which includes the Gurney Unit). It eventually reached Egan, who wrote a response dated October 14, 2004. In this response, Egan says that Garcia's complaint has previously been addressed in a grievance by Dr. Love, a medical decision was made that the tinted lenses which Garcia had were medically unnecessary and so they were given to security, in accordance with Warden Swift's instructions that tinted lenses would not be allowed unless medically necessary, there was no conversation with Garcia regarding his right to ask questions or to talk to the provider, and Garcia

was "argumentative and aggressive," so his prostate exam was deferred and completed by another provider.

## Legal Standards and Analysis

Garcia's complaint centers around the confiscation of his glasses by physician's assistant Cheryl Egan, which he says was done in deliberate indifference to his serious medical needs. The Fifth Circuit has held that deliberate indifference to a convicted inmate's serious medical needs could state a civil rights violation, but a showing of nothing more than negligence does not. Norton v. Dimazana, 122 F.3d 286, 291 (5th Cir. 1997); Jackson v. Cain, 864 F.2d 1235, 1246 (5th Cir. 1989). However, simple disagreement with the medical treatment received or a complaint that the treatment received has been unsuccessful is insufficient to set forth a constitutional violation. Johnson v. Treen, 759 F.2d 1236, 1238 (5th Cir. 1985); Norton, 122 F.3d at 293.

Furthermore, malpractice alone is not grounds for a constitutional claim. Varnado v. Collins, 920 F.2d 320, 321 (5th Cir. 1991). Negligent or mistaken medical treatment or judgment does not implicate the Eighth Amendment and does not provide the basis for a civil rights action. Graves v. Hampton, 1 F.3d 315, 319-20 (5th Cir. 1993). The Fifth Circuit has held that the fact that medical care given is not the best that money can buy, and the fact that a dose of medication may occasionally be forgotten, does not amount to deliberate indifference to serious medical needs. Mayweather v. Foti, 958 F.2d 91 (5th Cir. 1992).

More pertinently, the Fifth Circuit has held that an inmate who had been examined by medical personnel on numerous occasions failed to set forth a valid showing of deliberate indifference to serious medical needs. Spears v. McCotter, 766 F.2d 179, 181 (5th Cir. 1985). It should be noted in this regard that medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference to serious medical needs. Banuelos v. McFarland, 41 F.3d 232, 235 (5th Cir. 1995).

In Domino v. TDCJ-ID, 239 F.3d 752 (5th Cir. 2001), a inmate who was a psychiatric patient expressed suicidal ideations and the psychiatrist returned him to his cell after a five-minute

6

examination; the inmate committed suicide two and a half hours later. The Fifth Circuit, in reversing a denial of summary judgment by the district court, stated as follows:

> Deliberate indifference is an extremely high standard to meet. It is indisputable that an incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference. Johnson v. Treen, 759 F.2d 1236, 1238 (5th Cir. 1985). Rather, the plaintiff must show that the officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." Id. Furthermore, the decision whether to provide additional medical treatment "is a classic example of a matter for medical judgment." Estelle v. Gamble, 429 U.S. 97, 107 (1972). And, "the failure to alleviate a significant risk that [the official] should have perceived, but did not," is insufficient to show deliberate indifference. Farmer v. Brennan, 511 U.S. 825, 838 (1994).

Domino, 239 F.3d at 756; *see also* Stewart v. Murphy, 174 F.3d 530, 534 (5th Cir. 1999).

In this case, the medical records show that Garcia's eyeglasses were taken away because the Gurney Unit did not allow tinted lenses unless there was a finding by a medical provider affiliated with TDCJ-CID that they are medically necessary, and there was no such finding in this case. It should be noted that from February of 2004 until the present, the records contain no finding that tinted lenses are medically necessary for Garcia

Although Warden Pratt, who is a warden at the Michael Unit, testified at the Spears hearing that inmates are allowed to have tinted lenses, the records reflect that the policy at the Gurney Unit provided that inmates could have tinted lenses only if medically necessary. An affidavit from Warden Swift, who is at the Gurney Unit, says that because of security reasons, inmates cannot wear tinted lenses without a prescription from a licensed medical provider; he states that inmates under the influence of illicit drugs may wear tinted glasses to disguise this, and inmates involved in an assault may wear tinted lenses to hide any signs of injury. Garcia's medical records show no indication that he had a prescription for tinted lenses or that they were medically necessary, and so his glasses were confiscated.

Garcia's primary complaint thus is nothing more than disagreement with the determination made by Egan that his glasses were not medically necessary and therefore subject to confiscation. His work restrictions included limited sun exposure, but this was because of a previous history of

7

skin cancer, not light sensitivity of the eyes.  He has never, from February of 2004 until the present, received any prescription for tinted lenses, nor do his records reflect in any other way that such lenses are necessary.

As stated above, the Fifth Circuit has held that simple disagreement with medical treatment received does not rise to the level of a constitutional violation.  <u>Norton</u>, 122 F.3d at 293.  Garcia's disagreement regarding the medical necessity of his glasses thus does not set out a constitutional claim.

Furthermore, Garcia stated at the <u>Spears</u> hearing that he had two pairs of glasses.  His medical records reflect that he complained only once about the confiscation of his glasses, and there is no indication that he ever suffered any harm as a result of the taking of his glasses beyond one bout of dizziness a few days afterward.  While vision correction is unquestionably a serious medical need, Garcia has not shown that the taking of one pair of his glasses harmed him in this regard because, as he concedes, he had a second pair.

To the extent that Garcia complains about the taking of his glasses as a loss of property (apart from its medical implications), his claim is without merit.  The doctrine of <u>Parratt v. Taylor</u>, 451 U.S. 527 (1981) (overruled in part on grounds not relevant here) and <u>Hudson v. Palmer</u>, 468 U.S. 517 (1984), known collectively as the *Parratt/Hudson Doctrine*, states that a random and unauthorized deprivation of a property or liberty interest does not violate procedural due process if the State furnishes an adequate post-deprivation remedy.  *See* <u>Caine v. Hardy</u>, 943 F.2d 1406, 1412 (5th Cir. 1991).  Three predeprivation conditions must exist before the doctrine can be applied.  These are: (1) that the deprivation be unpredictable; (2) that predeprivation process be impossible, making any additional safeguard useless; and (3) that the conduct of the state actor be unauthorized.  Where these conditions exist, the State cannot be required to do the impossible by providing predeprivation process.  <u>Charbonnet v. Lee</u>, 951 F.2d 638, 642 (5th Cir. 1992), *citing* <u>Zinermon v. Burch</u>, 494 U.S. 113 (1990); <u>Myers v. Klevenhagen</u>, 97 F.3d 91, 94-95 (5th Cir. 1996).

Hudson holds that deprivations of property by prison officials, even when intentional, do not violate the Due Process Clause of the Fourteenth Amendment provided that an adequate state post-deprivation remedy exists. Hudson, 468 U.S. at 533. The Texas state administrative and judicial systems provide an adequate state post-deprivation remedy. Tex. Gov. Code Ann. art. 501.007 (Vernon Supp. 1994); *see also* Murphy v. Collins, 26 F.3d 541, 543-44 (5th Cir. 1994). Thus, the appropriate forum for the plaintiff's claim for the deprivation of his property lies in state court or in the administrative procedures of TDCJ rather than federal court. Simmons v. Poppell, 837 F.2d 1243 (5th Cir. 1987).

Garcia also raises, in an oblique manner, a retaliation claim, indicating that Egan confiscated his glasses because he had insisted on a prostate exam. In Jones v. Greninger, 188 F.3d 322 (5th Cir. 1999), the Fifth Circuit expressed the law as follows:

> To state a valid claim for retaliation under section 1983, a prisoner must allege (1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a retaliatory adverse act, and (4) causation.

Jones, 188 F.3d at 325-26. The Court went on to note that if the inmate was unable to point to a specific constitutional right that was violated, the claim would fail.

More recently, the Court has noted that the "retaliatory adverse act" must be more than *de minimis* or inconsequential to sustain a showing of a constitutional violation. Morris v. Powell, --- F.3d ---, slip op. no. 05-40578 (5th Cir., May 15, 2006) (not yet published) (available on WESTLAW at 2006 WL 1314329). In this case, the Court will assume, without deciding, that the confiscation of a pair of eyeglasses is more than a *de minimis* or inconsequential act, and that asking for a prostate exam is a constitutionally protected activity which can be the object of a retaliation claim.

However, Garcia has failed to meet the element of causation, which the Fifth Circuit has said requires a showing that but for the alleged retaliatory motive, the incident complained of would not have occurred. Woods v. Smith, 60 F.3d 1161, 1166 (5th Cir. 1995). Here, Garcia has failed to show that but for his action in asking for a prostate exam, the incident complained of would not have

occurred. Instead, the evidence shows that Garcia's glasses were confiscated because he did not have a prescription for tinted lenses, a fact which would have been true whether or not he requested a prostate exam. His retaliation claim is without merit.

In a related claim, Garcia appears to assert that there was a racial motivation in Egan's actions because she allowed a Caucasian inmate to keep his tinted lenses. However, as noted above, prisoners are not prohibited from having tinted lenses, so long as they have a doctor's prescription to allow these lenses. In saying that Egan allowed this other inmate to keep his tinted lenses because of his race, Garcia simply speculates that this other inmate also did not have a prescription, making the keeping of the tinted lenses race-based rather than medical.

The Fifth Circuit has stated that to demonstrate a violation of his equal protection rights, the plaintiff must show purposeful discrimination resulting in a discriminatory effect among persons similarly situated. Muhammed v. Lynaugh, 966 F.2d 901, 903 (5th Cir. 1992). In this case, Garcia has not shown a violation of his equal protection rights because he has failed to show that he was similarly situated to the Caucasian inmate, in that there is no showing that this inmate, like Garcia, lacked a prescription for tinted lenses. To the extent that Garcia complains of a violation of his right to equal protection, this claim is without merit.

Garcia also complained that he was assigned to work in the fields, contrary to his medical restrictions. At the Spears hearing, he testified that while at the Gurney Unit, he worked in the fields for a total of two days.

The Fifth Circuit has stated that requiring an inmate to work beyond his physical capacity may raise a valid civil rights issue, but the plaintiff must show that the work has been assigned with knowledge of the condition and that it will be worsened thereby, or continued with the same knowledge. As a result, the Fifth Circuit said, only if the officials know that the work assigned will significantly aggravate a serious medical condition will there be an Eighth Amendment violation. Jackson v. Cain, 864 F.2d 1235, 1246 (5th Cir. 1989). In other words, the Fifth Circuit has said, if prison officials assign an inmate to a work detail and they know that such an assignment could

exacerbate a serious physical ailment, then such a decision could constitute deliberate indifference. Mendoza v. Lynaugh, 989 F.2d 191, 194 (5th Cir. 1993).

In this case, the prison records show that Garcia's medical restrictions were consistent with an assignment to work in the garden squad, which is an assignment designed for inmates with such restrictions. His restrictions, including those given to him by Graves on March 3, 2004, included limited standing, no walking over 300 yards, no lifting over 25 pounds, and no squatting. The answers to Garcia's grievances showed, and Warden Pratt confirmed at the Spears hearing, that these restrictions are not inconsistent with assignment to a medical squad. Although Garcia testified that he worked with other inmates who were members of the regular hoe squad, the relevant question is not who he worked with but whether the job assignment was given to him in deliberate indifference to his medical needs, and there is no evidence to support such a conclusion. Garcia's claim on this point is without merit.

Garcia acknowledged at the hearing that he did not want to sue DeShields and West. He said that Moore denied his grievances, but the Fifth Circuit has held that inmates do not have a constitutionally protected liberty interest in having grievances resolved to their satisfaction, and so there is no violation of due process when prison officials fail to do so. Geiger v. Jowers, 404 F.3d 371, 373-74 (5th Cir. 2005); *accord*, Edmond v. Martin, et al., slip op. no. 95-60666 (5th Cir., Oct. 2, 1996) (unpublished) (holding that claim that official "failed to investigate and denied his grievance" did not raise a constitutional claim); Thomas v. Lensing, et al., slip op. no. 01-30658 (5th Cir., Dec. 11, 2001) (unpublished). Garcia's claim against Moore is without merit.

The final named defendant in the lawsuit is Warden Swift of the Gurney Unit. Garcia testified that Warden Swift was responsible for what occurred at the Gurney Unit and so should be liable to him. The Fifth Circuit has held that lawsuits against supervisory personnel based on their positions of authority are claims of liability under the doctrine of *respondeat superior*, which does not generally apply in Section 1983 cases. Williams v. Luna, 909 F.2d 121 (5th Cir. 1990). A supervisor may be held liable if there is personal involvement in a constitutional deprivation, a

causal connection between the supervisor's wrongful conduct and a constitutional deprivation, or if supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force behind a constitutional deprivation. Thompkins v. Belt, 828 F.2d 298 (5th Cir. 1987).

In this case, Garcia has not shown that Warden Swift was personally involved in a constitutional deprivation, nor that a causal connection existed between wrongful conduct by Swift and a constitutional deprivation. Apparently there was a policy implemented at the Gurney prohibiting inmates from possessing tinted lenses without a medical prescription, but Garcia has not shown that this policy was so deficient as to amount to a repudiation of constitutional rights, nor that it was the moving force behind a constitutional deprivation. For this reason, his claim against Warden Swift is without merit and his lawsuit may be dismissed.

## Conclusion

28 U.S.C. §1915A requires that as soon as practicable, district courts must review complaints wherein prisoners seek redress from governmental entities or their employees. Section 1915A(b) requires that upon review, the court shall identify cognizable claims or dismiss the complaint or any portion thereof if the complaint is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief.

The term "frivolous" means that a complaint lacks an arguable basis in law or fact; a complaint is legally frivolous when it is based upon an indisputably meritless legal theory. Neitzke v. Williams, 490 U.S. 319, 325-7 (1989). A complaint fails to state a claim upon which relief may be granted if as a matter of law, it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. Neitzke, 490 U.S. at 327, *citing* Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); *see also* Blackburn v. City of Marshall, 42 F.3d 925, 931 (5th Cir. 1995).

In this case, Garcia's claims lack any arguable basis in law and fail to state a claim upon which relief may be granted in federal court. For this reason, his lawsuit may be dismissed. *See generally* Thompson v. Patteson, 985 F.2d 202, 204 (5th Cir. 1993). It is accordingly

ORDERED that the above-styled civil action be and hereby is DISMISSED as frivolous with prejudice as to its refiling in federal court, but without prejudice as to any claims which Garcia may wish to file in state court, whether for claims of medical negligence or for the loss of his property in a conversion action.[3] 28 U.S.C. §1915A(b). It is further

ORDERED that any and all motions which may be pending in this cause are hereby DENIED.

So **ORDERED** and **SIGNED** this **27** day of **June, 2006.**

_____
JUDITH K. GUTHRIE
UNITED STATES MAGISTRATE JUDGE

---

[3] The Court offers no opinion as to how a state court may view the statute of limitations, particularly with regard to the time that this federal lawsuit was pending. *See* Turner v. Texas Department of Mental Health and Mental Retardation, 920 S.W.2d 415, 417-18 (Tex.App.-Austin 1996, writ denied).